UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

STEPHANIE MELISSA WILTSIE,

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

17-CV-1201

DECISION AND ORDER

---

On November 21, 2017, the plaintiff, Stephanie Melissa Wiltsie, brought this action under the Social Security Act ("the Act"). She seeks review of the determination by the Commissioner of Social Security ("Commissioner") that she was not disabled. Docket Item 1. On July 27, 2018, Wiltsie moved for judgment on the pleadings, Docket Item 21; on September 27, 2018, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 24; and on October 19, 2019, Wiltsie replied, Docket Item 25.

For the reasons stated below, this Court grants Wiltsie's motion in part and denies the Commissioner's cross-motion.

## **BACKGROUND**

### I. PROCEDURAL HISTORY

On June 11, 2014, Wiltsie applied for Supplemental Security Income and disability insurance benefits. *Id.* at 15. She claimed that she had been disabled since

January 16, 2013, due to hydrocephalus, hypertension, sleep disorder, and mood disorder. *Id.* at 314.

On September 15, 2014, Wiltsie received notice that her application was denied because she was not disabled under the Act. *Id.* at 335-50. She requested a hearing before an administrative law judge ("ALJ"), *id.* at 351-62, which was held on January 5, 2017, *id.* at 253. The ALJ then issued a decision on April 3, 2017, confirming the finding that Wiltsie was not disabled. *Id.* at 28. Wiltsie appealed the ALJ's decision, but her appeal was denied, and the decision then became final. *Id.* at 6-8.

## II. RELEVANT MEDICAL HISTORY

"Hydrocephalus is the buildup of too much cerebrospinal fluid in the brain. Normally, this fluid cushions [the] brain. When [someone] has too much, though, it puts harmful pressure on [the] brain." *See* https://medlineplus.gov/hydrocephalus.html. "Hydrocephalus can permanently damage the brain, causing problems with physical and mental development." *Id.* "If untreated, it is usually fatal." *Id.* "With treatment, many people lead normal lives with few limitations." *Id.* "Treatment usually involves surgery to insert a shunt." *Id.* "A shunt is a flexible but sturdy plastic tube." *Id.* "The shunt moves the cerebrospinal fluid to another area of the body where it can be absorbed." *Id.*

Wiltsie has had "difficulties with hydrocephalus" since birth. Docket Item 7 at 748. Her hydrocephalus has been managed with a shunt since she was three weeks old. *Id.* at 748, 1087. Throughout Wiltsie's alleged period of disability, she had a number of medical issues, including several "shunt failures."

2

### A. 2013-2014

In early 2013, Wiltsie's shunt malfunctioned and she required surgery. *Id*. at 524-25. Doctors intended to modify or replace her shunt, but because they discovered an infection, the procedure was aborted and instead "[a]n external ventricular drain" was put in place. *Id*. at 834. On February 4, 2013, Wiltsie again underwent surgery to have the shunt reintroduced after it was removed because of the infection. *Id*. at 847.

On March 3, 2013, Wiltsie reported that her February surgery resulted in "a complete resolution of her headaches." *Id*. at 849. "She no longer has blurred vision or double vision. She has no fevers or chills." *Id*. Likewise, on August 6, 2014, Wiltsie said that she "had been remarkably well" between that time and her February 2013 shunt revision. *Id*. at 852. At that time, she reported the "complete resolution of her headaches" and denied having dizziness, blurry vision, double vision, vomiting, fevers, or chills. *Id.*

In the meantime, on June 28, 2013, Wiltsie had surgery for "ventral hernia repair." *Id*. at 648. She also was diagnosed with uterine cancer in mid-2014, *see id*. at 852, and she underwent adhesiolysis, abdominal hysterectomy, oophorectomy, lymphadenectomy, and cystectomy on August 21, 2014. *Id*. at 756, 859.

On August 28, 2014, Wiltsie was admitted to the intensive care unit. *Id*. at 864. Because of an abdominal infection, Wiltsie "underwent shunt externalization" on August 30, 2014. *Id*. Her shunt was again internalized again on September 10, 2014, and she was discharged from the hospital on September 12, 2014. *Id.*

On November 19, 2014, Wiltsie was seen by Dallen Ashby, M.D., a radiologist, and she again complained of headaches. *Id*. at 1086. Dr. Ashby found that a "fluid collection ha[d] developed around [Wiltsie's] shunt catheter overlying the right temporal

3

bone," findings that were "consistent with shunt malfunction." *Id*. Doctors sent Wiltsie to the University of Pittsburgh Medical Center ("UPMC") due to the complexity of her shunt issues. *Id*. at 1098. The following day, Wiltsie was admitted to UPMC where she complained of increased headaches. *Id*. at 1087. Wiltsie was "found to have a malplaced shunt catheter." *Id.* Doctors operated on Wiltsie on November 24, 2014, and she was discharged the following day. *Id*. Her "shunt was externalized and then put back in." *Id*. at 1098.

### B.     2015

Throughout most of 2015, the record is silent as to whether Wiltsie had further issues related to her shunt. In February 2015, however, Wiltsie went to the emergency room complaining of abdominal pain. *Id*. at 1098. She was told "that it might be her gallbladder but no imaging was done." *Id*.

On April 28, 2015, Wiltsie saw Dr. Jeremy Riedesel, M.D., a family practice physician, for a follow up. *Id*. at 1097-1100. She complained about abdominal pain: "When it hits, [it's] severe." *Id*. at 1098.

On June 26, 2015, Wiltsie returned to the emergency room "after having an intermittent headache for [three] weeks." *Id*. at 1103. Doctors found her "blood pressure [to be] elevated at 180," and she was prescribed metoprolol. *Id*. On June 29, 2015, Wiltsie told Dr. Riedesel that she was "overall feeling stable and better since discharge." *Id*. at 1102.

From September 18, 2015, to September 22, 2015, Wiltsie was admitted to the hospital "after months of abdominal pain that came and went." *Id*. at 1132-33. Doctors concluded that she may have a "mildly dysfunctional gallbladder." *Id*. at 1133. Wiltsie

4

was "discharged home on a low-fat diet with no medications other than proton pump inhibitor." *Id.*

On December 6, 2015, Wiltsie returned to the emergency room complaining of moderate chest pain "along the lower right chest wall where her VP shunt is tunnelled." *Id.* at 1193. She was discharged on the same day. *Id.* On December 11, 2015, Wiltsie saw Jody Leonardo, M.D., a neurosurgeon, who ruled out shunt malfunction. *Id.* at 883-84.

### C.     2016

On February 8, 2016, Wiltsie was treated at WCA Hospital for right-sided head pain and chest pain. *Id.* at 1212. She was discharged on the same day with instructions to follow up with a neurosurgeon regarding the possibility that there were more issues with her shunt. *Id.* at 1218.

On May 12, 2016, Wiltsie saw Jacquelyn Peterson, a physician assistant, complaining of a headache. *Id.* at 1227. Unlike the headaches associated with her hydrocephalus, Wiltsie said that this one was in a "different area" and "not as severe." *Id.* She was advised to schedule a CT scan with a neurologist. *Id.* at 1229. Peterson also increased Wiltsie's blood pressure medication. *Id.*

After getting the CT scan, Wiltsie saw Kevin Gibbons, M.D., a neurosurgeon, on May 26, 2016. *Id.* at 1233. Dr. Gibbons compared the CT scan to a CT scan from the previous December, and he found that it "demonstrates slit ventricles with complete collapse on the right and collapse of the frontal horn on the left with some posterolateral ventricle seen on the left hand side." *Id.* But Dr. Gibbons was "not 100% convinced [that Wiltisie] ha[d] shunt malfunction." *Id.* On May 28, 2016, doctors adjusted her

shunt, *id.* at 1253, and on July 14, 2016, Wiltsie reported that "[h]er headaches have completely resolved." *Id.*

On July 13, 2016, and again on July 21, 2016, Wiltsie was assessed by licensed clinical social workers at the Chautauqua County Department of Mental Hygiene ("CCDMH"). *Id.* at 914-33. She sought treatment for mood disturbance, depression, and sleeplessness. *Id.* at 914. The social workers found that Wiltsie would "benefit from counseling services to help her process underlying issues contributing to her mood issues." *Id.* at 932. On August 1, 2016, Wiltsie returned to CCDMH "to complete screening forms" and "to work on [a] relapse prevention plan identifying triggers for distress and key supports that [Wiltsie] can seek out." *Id.* at 934. Wiltsie returned again on August 8, 2016, to review and complete her relapse plan. *Id.* at 937. Wiltsie also completed a depression screen "that identified moderate depression." *Id.*

On August 15, 2016, Wiltsie did not show up for her appointment with her counselor. *Id.* at 940. Instead, she returned to the emergency room with shunt-related issues. *Id.* at 1282. She had "progressively worsening headaches over the course of [one] week associated with blurring of her vision and nausea." *Id.* Wiltsie was diagnosed with "shunt failure" and was "taken to surgery urgently for revision of the shunt due to progressive sleepiness." *Id.* at 1298.

After the surgery, Wiltsie "remained neurologically intact but had persistently elevated fevers for which she was started on vancomycin." *Id.* at 1307. Five days after her shunt revision, Wiltsie "was again taken to the operating room for externalization of the shunt and placement of [an] external ventricular drain." *Id.* "After surgery she was

6

transferred to the neuro ICU for close monitoring of intracranial pressure and neurological exam." *Id.*

Once her complications subsided, Wiltsie returned to the operating room on August 31, 2016, for removal of her external shunt and reinsertion of her VP shunt. *Id*. She was evaluated by a physical therapist, cleared to go home, and discharged from the hospital on September 2, 2016. *Id*. at 1309-11. Although Wiltsie was encouraged to walk, she was instructed not to engage in strenuous activity, not to lift more than five pounds, not to bend, not to twist, not to travel, and not to return to work until after a follow-up appointment. *Id*. at 1311.

On September 14, 2016, Wiltsie visited Chad Chitester, a physician assistant, for a follow-up visit. *Id*. at 1357-60. Wiltsie was seen by a visiting nurse two to three times a week, but she told Chitester that she was "overall feeling stable and better since discharge." *Id*. at 1358. On October 20, 2016, Wiltsie returned to CCDMH "for a follow-up appointment to do an updated review and reflect on progress made up to this point and direction for treatment." *Id*. at 942. Wiltsie reported that she "feels better physically . . . but worries about if she will have further medical problems." *Id*. On November 7, 2016, Wiltsie was diagnosed with major depressive disorder and prescribed medication. *Id*. at 951.

### III.   VOCATIONAL EVIDENCE

At Wiltsie's hearing, the ALJ heard testimony from Wiltsie and from Alana Curtanic, a vocational expert ("VE"). Docket Item 7 at 255-93.

Wiltsie testified that during one month in October 2013, she worked about ten hours a week as a cashier at a dollar store. *Id*. at 266. She said that she had to leave

the job because she "started with the symptoms of the uterine cancer and ended up in the emergency room and the manager didn't want to understand that there was a medical problem and pretty much just terminated [her]." *Id.* at 268.

Curtanic offered her opinion that a person of Wiltsie's age, education, and experience with several limitations[1] could perform a number of jobs, including mail clerk, electronics worker, marker, small parts assembler, document preparer, or ticket checker. *Id.* at 287-88. In response to questioning by Wiltsie's attorney, Curtanic qualified her opinion by noting that those jobs would be unavailable for a person who must "miss more than a half a day up to one day per month" without calling in advance to advise the employer that the worker would not be coming to work. *Id.* at 290. Curtanic also opined that those jobs would be unavailable to a hypothetical worker who must miss more than three days in a month even if the worker called the employer in advance of each absence. *Id.*

---

[1] Specifically, the vocational expert offered her opinion about jobs available for a hypothetical individual with the following functional limitations: "This individual can lift and carry 20 pounds occasionally, and 10 pounds frequently. [She c]an stand and/or walk for two hours in an eight-hour workday, alternating after 30 minutes to sitting for 5 minutes. [She c]an occasionally stoop, kneel, crouch or crawl. [She c]an climb ladders, ropes or scaffolds. [She c]an do work that does not require driving a motor vehicle and can work in an environment with no exposure to hazards, such as unprotected heights or moving machinery." The individual must also "work in a low stress environment, [that is,] one with no supervisory responsibilities, no independent decision making required except with respect to simple, routine work-related decisions. No work at production rate pace required, and no more than minimal changes in work routines, processes or setting." And the individual can only "perform work that does not involve more than occasional interaction with the general public and does not require working in crowds of people." Docket Item 7 at 286-88.

## IV. THE ALJ'S DECISION

In denying Wiltsie's application, the ALJ evaluated Wiltsie's claim under the Social Security Administration's five-step evaluation process for disability determinations. *See* 20 C.F.R. § 404.1520. At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful employment. § 404.1520(a)(4)(i). If so, the claimant is not disabled. *Id.* If not, the ALJ proceeds to step two. § 404.1520(a)(4).

At step two, the ALJ decides whether the claimant is suffering from any severe impairments. § 404.1520(a)(4)(ii). If there are no severe impairments, the claimant is not disabled. *Id.* If there are any severe impairments, the ALJ proceeds to step three. § 404.1520(a)(4).

At step three, the ALJ determines whether any severe impairment or impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). If the claimant's severe impairment or impairments meet or equal one listed in the regulations, the claimant is disabled. *Id.* But if the ALJ finds that none of the severe impairments meet any in the regulations, the ALJ proceeds to step four. § 404.1520(a)(4).

As part of step four, the ALJ first determines the claimant's residual functional capacity ("RFC"). *See* §§ 404.1520(a)(4)(iv); 404.1520(d)-(e). The RFC is a holistic assessment of the claimant—addressing both severe and nonsevere medical impairments—that evaluates whether the claimant can perform past relevant work or other work in the national economy. *See* 20 C.F.R. § 404.1545.

After determining the claimant's RFC, the ALJ completes step four. 20 C.F.R. § 404.1520(e). If the claimant can perform past relevant work, he or she is not disabled

9

and the analysis ends. § 404.1520(f). But if the claimant cannot, the ALJ proceeds to step five. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f).

In the fifth and final step, the Commissioner must present evidence showing that the claimant is not disabled because the claimant is physically and mentally capable of adjusting to an alternative job. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1520(a)(v), (g). More specifically, the Commissioner bears the burden of proving that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

In this case, the ALJ determined at step one that Wiltsie had not engaged in "substantial gainful activity" since January 16, 2013, the alleged onset date. Docket Item 7 at 17. At step two, the ALJ found that Wiltsie had the following severe impairments: "hydrocephalus with periventricular shunt, ventral hernia status-post 2013 repair, major depressive disorder and post-traumatic stress disorder." *Id.* At step three, the ALJ determined that Wiltsie did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.* at 18.

In assessing Wiltsie's RFC, the ALJ determined that Wiltsie could perform "less than a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b)."[2] *Id.* at 21.

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a

10

> Specifically, the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently; and can stand and/or walk two hours in an eight-hour workday, alternating after 30 minutes to sitting five minutes. She has no limitation on her ability to sit. She can occasionally stoop, kneel, crouch or crawl and can occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds. She can work in an environment that does not involve exposure to hazards such as unprotected heights or moving machinery or to weather, extreme heat or humidity/wetness, and does not require driving a motor vehicle. Further, the claimant can work in a low-stress environment (meaning one with no supervisory responsibilities; no independent decision-making required except with respect to simple, routine work-related decisions; no work at production rate pace; and no more than minimal changes in work routines, processes, or settings). She can perform work that does not involve more than occasional interaction with the general public or work in crowds.

*Id.*

The ALJ concluded that Wiltsie's shunt-related medical impairments were substantial only during limited periods of shunt malfunction. *See id* at 22-25. The ALJ relied on record evidence from which one could infer that throughout Wiltsie's alleged period of disability, the intensity of her impairments between shunt revisions was limited. *See id.*

At step four, the ALJ determined that Wiltsie was unable to perform her past relevant work as an emergency medical technician or as a sales clerk. *Id.* at 26. At step five, the ALJ determined that the Commissioner sustained her burden of establishing that Wiltsie had the RFC to perform "jobs that exist in significant numbers in the national economy." *Id.* at 27. Specifically, the ALJ determined that Wiltsie could work as a mail clerk, electronics worker, marker, parts assembler, document preparer,

---

claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b).

11

or ticket checker.  *Id.* at 27-28.  The ALJ based that final conclusion on Curtanic's testimony.  *Id.* at 28.

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry."  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The court "must first decide whether [the Social Security Administration ("SSA")] applied the correct legal principles in making the determination."  *Id.*  This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).  Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'"  *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)).  "Substantial evidence" means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles."  *Johnson*, 817 F.2d a 986.

## **DISCUSSION**

Wiltsie argues that the ALJ's decision must be set aside because the ALJ failed to address an apparent conflict between the VE's testimony and Wiltsie's impairments. Specifically, the VE testified that "if [an] individual would be absent or would come in late more than . . . three days in a month," then that person "would not be able to maintain employment" at each of the positions that the VE considered. Docket Item 7 at 290. Wiltsie claims that her sporadic severe impairments "requir[ing] unanticipated numerous days of treatment" rendered her disabled in light of the VE's testimony, especially "[g]iven the numerous unplanned hospitalizations and emergency treatment" that she needed throughout her period of disability. Docket Item 21-1 at 16.

"ALJs must let the parties and the reviewing courts know, in some intelligible fashion, where they stand on the pivotal issues of fact posed by the applications they adjudicate." *Chiappa v. Sec'y of Dep't of Health, Educ. and Welfare*, 497 F. Supp. 356, 358 (S.D.N.Y. 1980). "Among the ALJ's legal obligations is the duty to adequately explain his reasoning in making findings on which his ultimate decision rests, and in doing so he must address all pertinent evidence." *Klemens v. Berryhill*, 703 F. App'x 35, 36 (2d Cir. 2017) (quoting *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010)).

"[T]he ALJ must *both* identify evidence that supports his conclusion *and* 'build an accurate and logical bridge from that evidence to his conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)) (emphasis in original). "[P]roviding 'an accurate and logical bridge' require[s] him to confront the evidence in [a claimant's] favor and explain why it [is] rejected before

concluding that her impairments [do] not impose more than a minimal limitation on her ability to perform basic work tasks." *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016) (quoting *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013)). "Where [courts] are 'unable to fathom the ALJ's rationale in relation to the evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ,' [courts] will not 'hesitate to remand for further findings or a clearer explanation for the decision.'" *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).

In this case, the VE opined that a person of Wiltsie's age, education, experience, and RFC could perform a number of jobs, including mail clerk, electronics worker, marker, small parts assembler, document preparer, or ticket checker. Docket Item 7 at 287-88. In response to questioning by Wiltsie's attorney, however, the VE qualified that opinion: she noted that those jobs would be unavailable to a person who must "miss more than a half a day up to one day per month" and who could not call in advance to advise the employer that the worker would not be coming to work. *Id.* at 290. And the VE opined that those jobs would be unavailable to a hypothetical worker who had to miss more than three days in a month even if the worker was able to call and warn the employer in advance about being absent from work. *Id.*

In her decision, the ALJ relied on the VE's findings in concluding that Wiltsie was not disabled because she was able to perform the jobs noted above. *Id.* at 27-28. But because the ALJ did not address Wiltsie's likely absenteeism arising from her combination of impairments, her decision did not build the necessary bridge between

14

the evidence and the ALJ's conclusion. And Wiltsie's actual medical history makes that crystal clear.

Under the Act, a claimant is entitled to disability insurance benefits or supplemental security income if the claimant is disabled. A "disability" is the 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "[T]he statute's '[twelve] month' duration requirements apply to both the 'impairment' and the 'inability' to work requirements." *Barnhart v. Walton*, 535 U.S. 212, 222-223 (2002). A severe impairment may result from one "impairment or [a] combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." *See* 20 C.F.R. § 404.1520(c).

Here, there is no doubt that Wiltsie had an impairment or combination of impairments that lasted at least twelve months. For example, the ALJ found her hydrocephalus to be a severe impairment, and she has had that condition since birth. Docket Item 7 at 17. So the ALJ was required to confront and address Wiltsie's evidence that she was unable to work for a twelve-month period during her alleged period of disability resulting from the combination of all her conditions, including her hydrocephalus. *See Klemens*, 703 F. App'x at 36.

Wiltsie's shunt malfunctions, their complications, and her other impairments combined to put her in in the hospital regularly during her alleged period of disability. Indeed, shunt malfunctions and related issues caused doctor office visits, hospital visits, and surgeries—often of an urgent or emergency nature—in January 2013, *id.* at 834;

15

February 2014, *id.* at 847; August-September 2014, *id.* at 864; November 2014, *id.* at 1087, 1098; February 2016, *id.* at 1212; May 2016, *id.* at 1227, 1233, 1254; and August-September 2016, *id.* at 1282, 1298, 1309-11, 1357-60. Some of these visits were unexpected hospital stays that lasted for weeks. For example, she was admitted to the intensive care unit because of shunt-related issues on August 28, 2014, and was not discharged from the hospital until September 12, 2014. *Id.* at 864. On August 15, 2016, she was admitted to the hospital because of shunt-related issues and she was not discharged until September 2, 2016. *Id.* at 1282, 1309-11.

What is more, while Wiltsie found herself frequenting doctors and hospitals—sometimes unexpectedly for weeks at a time—because of shunt-related issues, she also suffered from several other impairments that independently and regularly brought her to hospitals and doctors. For example, Wiltsie was diagnosed with uterine cancer in 2014 and had surgery to deal with that cancer on August 21, 2014. *Id.* at 756, 852, 859. Wiltsie's high blood pressure also resulted in headaches that required at least one emergency room visit on June 26, 2015. *See id.* at 1102-03. And she had issues with her gallbladder that sometimes required her to visit the doctor—including one visit on April 28, 2015. *See, e.g., id.* at 1098.

Viewing the evidence as a whole, Wiltsie suffered from a combination of impairments that required her—often unexpectedly—to visit doctors and hospitals quite often. The VE testified that medical absences from work might affect employability. *See, e.g., id.* at 290. And Wiltsie testified that she, in fact, lost the one job she had during her alleged period of disability as a result of her medical-related absences. *Id.* at 268. But the ALJ did not address that issue in her decision.

16

In light of all that, Wiltsie has established an apparent unresolved conflict between the evidence and the ALJ's findings. The VE's testified that Wiltsie could not maintain a job if she had to repeatedly miss work, Wiltsie submitted substantial medical evidence that her combination of impairments had resulted and would result in unexpected medical absences from work, but the ALJ never weighed that evidence at step five. The ALJ's failure to address this apparent conflict before relying on the VE's testimony to conclude that Wiltsie could still perform substantial gainful activity was an error. *See Arnold v. Comm'r of Soc. Sec.*, 2019 WL 2521179, at *6-*7 (W.D.N.Y. June 19, 2019) ("Based on the record (and the ALJ's implicit acknowledgement) that Plaintiff would have missed as many as six weeks of work that year, the ALJ's failure to address the issue of absenteeism was legal error"); *Hayden v. Comm'r of Soc. Sec.*, 338 F. Supp. 3d 129, 138 (W.D.N.Y. 2018) (remanding for the ALJ to consider conflict between VE testimony that employers allow an unexcused absence about one time a month and treating psychiatrist report that claimant would miss work two days per month). Therefore, the case is remanded to provide the ALJ with an opportunity to address Wiltsie's likely medical absenteeism in light of her combination of impairments.[3]

---

[3] This Court "will not reach the remaining issues raised by [Wiltsie] because they may be affected by the ALJ's treatment of this case on remand." *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## **CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 24, is DENIED, and Wiltsie's motion for judgment on the pleadings, Docket Item 21, is GRANTED in part and DENIED in part. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.

SO ORDERED.

Dated: July 16, 2019
          Buffalo, New York

                                      *s/ Lawrence J. Vilardo*
                                      LAWRENCE J. VILARDO
                                      UNITED STATES DISTRICT JUDGE